IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 4, 2019

## STATE OF TENNESSEE v. THOMAS R. BOYKIN

**Appeal from the Circuit Court for Gibson County**
**No. 19074     Clayburn Peeples, Judge**

_____

### No. W2018-01207-CCA-R3-CD

_____

A Gibson County jury convicted Thomas R. Boykin, Defendant, of two counts of aggravated child abuse of a child under eight years of age.  The trial court sentenced Defendant as a Range II multiple offender to consecutive thirty-five-year sentences at 100%.  In this delayed direct appeal, Defendant challenges his convictions, claiming the trial court improperly admitted evidence, cumulative error, and insufficiency of the evidence.  Defendant also challenges his sentences, claiming improper use of sentencing enhancement factors and consecutive sentencing factors.  After a thorough review of the record and applicable case law, we affirm the judgments of the trial court and remand for entry of corrected judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Cristy C. Cooper, Martin, Tennessee, for the appellant, Thomas R. Boykin.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Tommy A. Thomas, District Attorney General (pro tem); and Hillary Parham and Jerald Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### Procedural History

Following sentencing, Defendant filed an untimely motion for a new trial, which the trial court denied.  Defendant then filed an untimely appeal, which this court

dismissed in August 2016. *State v. Thomas R. Boykin*, No. W2016-00172-CCA-R3-CD, 2016 WL 4575721, at *3 (Tenn. Crim. App. Aug. 31, 2016), *no perm. app. filed*. Defendant filed a pro se Petition for Post-Conviction Relief, and after a hearing, the post-conviction court granted Defendant a delayed appeal pursuant to Tennessee Code Annotated section 40-30-113. Defendant then timely filed a notice of appeal on June 28, 2018. On October 22, 2018, Defendant filed a motion requesting that this court remand the case for the filing of a motion for a new trial pursuant to Tennessee Code Annotated section 40-30-113(a)(3) before continuing with the delayed appeal, and this court granted the motion. Order, *State v. Thomas R. Boykin*, W2018-01207-CCA-R3-CD (Tenn. Crim. App. Nov. 1, 2018). The trial court heard Defendant's motion for new trial and denied it on March 11, 2019. This court ordered the trial court clerk to supplement the appellate record with all documents relating to the motion for a new trial, and the supplement was filed April 23, 2019. Order, *State v. Thomas R. Boykin*, W2018-01207-CCA-R3-CD (Tenn. Crim. App. Mar. 22, 2019).

## Factual History

### *Jury Trial*

Officer Brent Autrey testified that, in March of 2014, he was employed with the Milan Police Department ("MPD") and that he responded to a call on Short Anderson Street regarding an unresponsive child, the three-year-old victim. Officer Autrey stated that medical personnel were at the scene when he arrived. He noted that the victim was lying on a bed, fully dressed, and surrounded by paramedics. Officer Autrey asked Defendant and the victim's mother, Mary Taylor, to step into a different room to give paramedics room to work. Defendant told Officer Autrey that he left the victim in the bathtub for "just a second" and told the victim not to get out of the bathtub. Defendant informed Officer Autrey that, when he returned to the bathroom, the victim was "coming in and out of consciousness" and that "one eye was looking at [Defendant] and one eye was looking away." Defendant stated that he picked up the victim and ran across the street to the house of a neighbor, Vicky Scott, because he and Ms. Taylor did not have a phone to call 911. Defendant also told Officer Autrey that the victim received burns while playing with his cousins the previous weekend but that he was unsure how that happened.

Sergeant Chris Matheney testified that he was a patrol sergeant with the MPD. He stated that he responded to the call on Short Anderson Street on March 5, 2014. When Sergeant Matheney arrived, paramedics were bringing the victim down the stairs, and Sergeant Matheney followed them to the hospital. Sergeant Matheney witnessed hospital personnel remove the victim's pants and noted that the victim's right buttock "was missing some skin and then there were . . . diagonal marks across his buttocks that

- 2 -

appeared to be burns." Sergeant Matheney testified regarding each of the photographs taken of the victim at the hospital that night. He stated that the photos showed skin missing from the victim's wrist, blisters on the victim's left hand, skin missing from the victim's left thumb, the victim's swollen knuckles, marks on the victim's face, and severe burns on the victim's buttocks. Sergeant Matheney stated that, while he did not remember visible injuries to the victim's abdomen, the victim kept "clutching his stomach like he was hurting[.]" Once his lieutenant arrived at the hospital to take over the investigation, Sergeant Matheney returned to Defendant's residence on Short Anderson Street and took photographs of heaters in the home. On cross-examination, Sergeant Matheney agreed that he did not see who caused the burns or scars on the victim.

The victim's sister, K.W., was seven years old at the time of the offense and nine years old at the time of trial. K.W. testified that she currently lived in a foster home but that she used to live with her brother, the victim, her sister, "J.W.," her mother, Ms. Taylor, and "the mean man," whom she identified as "T-Ray." K.W. stated that, on the day the victim went to the hospital, he slipped in the bathtub. K.W. said that she heard a "boom" when Defendant was in the bathroom alone. K.W. remembered that she previously told the forensic interviewer that she heard "[t]he mean man put [the victim's] head in the water and dragged [sic] [the victim] in the tub. I mean, dragged him into something. That ain't [sic] the tub." She testified that the victim said "glub, glub, glub, and he cried." K.W. stated that Defendant often hit the victim with a belt because he "peed his pants." K.W. said that she knew Defendant hit the victim with a belt, even though she never saw it, because Defendant would also hit her with a belt. K.W. did not recall Defendant hitting the victim with his fists. K.W. stated that her mother never stopped Defendant from hitting because she was "too scared" of Defendant. K.W. recalled Defendant "being mean" to her mother and her mother saying "no" and "stop" to Defendant.

The State showed K.W. a portion of the video from her forensic interview which contradicted her testimony.[1] The State asked K.W. if what she said in the video was true. K.W. said that the video was true and agreed that she did not remember because it had been a long time since the video was recorded.

On cross-examination, K.W. agreed that she told the forensic interviewer that the victim told her he "got burned by the heater." K.W. stated that she went into her

---

[1] The trial exhibits were not included in the record, so this court cannot review the forensic video or the transcript of the video which was provided to the jury. However, during the jury-out hearing prior to the admission of the video, the State told the court that, in the video, K.W. said that Defendant hit the victim with his fists and that Defendant was the only person with the victim in the bathroom when she heard a "thump" from the bathroom.

mother's room and saw "black stuff" on the heater after the victim was burned. Defense counsel identified seven individuals to K.W. and asked her if any of those individuals suggested to her that the victim's injuries occurred in a certain way. K.W. said no.

On redirect examination, K.W. stated that the victim did not tell her he was burned on the heater, as she stated in the forensic interview, but that she deduced that he was burned on the heater because she saw "black stuff" on it. On recross-examination, the following exchange occurred:

> [DEFENSE COUNSEL]: [The prosecutor] changed your answer [on redirect examination]. But your answer to me [on cross-examination] was [that] you told [the forensic interviewer] that [the victim] told you he got burned on mama's heater. Is that true?
>
> [K.W.]: Nah. I forgot. I forgot he --
>
> [DEFENSE COUNSEL]: In fact, you forget a lot of stuff being nine years old. You would rather be doing something else than this, wouldn't you?
>
> [K.W.]: Uh-huh.

Mary Taylor testified that she was the victim's mother and Defendant's ex-girlfriend. Ms. Taylor stated that, at the beginning of 2014, Defendant lived with her and her three children and that her children called Defendant "T-Ray." Ms. Taylor agreed that the grand jury indicted her in the present case but stated that she gave her statement to investigators before she was indicted. She testified that her statement to investigators was not in exchange for a plea agreement.

Ms. Taylor said that, over the course of "a few weeks," Defendant abused the victim. Ms. Taylor testified that, on March 5, 2014, the victim "had an accident in his pants." She said that Defendant went into the victim's room to talk to him about his accident and that she heard Defendant yelling and the victim saying "no." Then Ms. Taylor heard "the wind from the belt" and "something that sounded like somebody falling on the floor." Ms. Taylor went into the room and asked Defendant if he was hitting the victim, and Defendant said no. Defendant and Ms. Taylor argued about Defendant hitting the victim. Defendant told her, "[W]hat did I tell you about interfering when I'm disciplining him?" Defendant told Ms. Taylor to go to her room, and she complied. Later, Defendant entered Ms. Taylor's bedroom, continued arguing, and choked her. Ms. Taylor blacked out. Ms. Taylor testified that Defendant then left the home, and she went to check on the victim. She said that the victim did not want to come to her. When Defendant returned to the home, Ms. Taylor ran a bath for the victim. Ms.

Taylor testified that the victim was in the tub, and Defendant was in the bathroom with him. She said that she did not hear a thump in the bathroom. Ms. Taylor stated that Defendant wrapped the victim in a towel and brought him out of the bathroom and that the victim was "going in and out" and "his eyes were rolling back." Ms. Taylor said that she and Defendant took the victim across the street to Ms. Scott's house to get assistance.

Ms. Taylor then testified as to an incident in early February 2014 when the victim's hands were broken. Defendant was in the living room disciplining the victim with a belt, and she "heard [her] son hit the floor." Ms. Taylor entered the living room and saw Defendant with the belt wrapped around his hand and about one foot of it loose. Defendant and Ms. Taylor argued about Defendant hitting the victim with a belt, and Defendant told her that the victim "fell on his own." Ms. Taylor testified that Defendant told the victim to "stop crying and get up." Ms. Taylor saw the victim rubbing his hands, and the victim did not want Ms. Taylor to touch him. Defendant then asked her, "[W]hat did I tell you about interfering when I'm disciplining him?" Defendant followed her to their bedroom, and he bit her.

Ms. Taylor testified that Defendant later told her that the victim burned his hands on the heater. Ms. Taylor put petroleum jelly and peroxide on the burns. Ms. Taylor stated that, about a week after the victim burned his hands, Defendant told her the victim backed into a heater and burned his buttocks while the victim was wrapped with a towel. Ms. Taylor said that the towel was not burned, so she questioned Defendant's explanation. This led to another confrontation between Ms. Taylor and Defendant. Ms. Taylor treated the burns herself because Defendant told her the Department of Children's Services ("DCS") would take her children if she took the victim to the hospital. Ms. Taylor recalled that the burns on the victim's buttocks occurred when Defendant was disciplining the victim. Ms. Taylor did not remember telling investigators that she heard the victim screaming on the day his buttocks were burned but agreed she may have said that. Ms. Taylor testified that she spanked her children's hands as discipline but never used a switch or belt because she was "scared of the marks that it may leave."

Ms. Taylor testified that, as of March 5, 2014, she had been treating the burns on the victim's buttocks for about a week and the burns on his hands for about two weeks. Ms. Taylor looked at the photographs of the victim that were taken at the hospital and testified that she did not know how marks got on his face and abdomen. She testified that she did not inflict any of the injuries on the victim. Ms. Taylor stated that she did not do more to protect the victim because Defendant threatened her, and she was scared. Ms. Taylor testified that she never told her daughters what to say if questioned regarding the victim's injuries and that she had not spoken with K.W. between March 5, when the incident occurred, and March 10, when K.W. gave her forensic interview.

The following exchange then occurred:

[THE STATE]: What kind of child is [K.W.]?

[MS. TAYLOR]: She's a very good child. She's a sweet child.

[THE STATE]: Is she an honest child?

[MS. TAYLOR]: The only way she lies is when she thinks she's going to get in trouble.

[THE STATE]: Would she lie about something like this?

[MS. TAYLOR]: No, sir.

[THE STATE]: Would she lie about what she saw?

[MS. TAYLOR]: No, sir.

[THE STATE]: She wasn't getting in any trouble, was she?

[MS. TAYLOR]: No, sir.

Ms. Taylor testified that she and Defendant dated for two months at the end of 2013 before he moved in with her and her children. She stated that her children never had any marks on them while she dated any previous boyfriends. Ms. Taylor said that the victim's wetting his pants "triggered what got [the victim] in trouble" with Defendant. She testified that the victim had been potty-trained, but when they moved into a new home at the beginning of 2014, the victim "was afraid to go to the bathroom."

On cross-examination, Ms. Taylor agreed that DCS had never taken her children before the incident in March 2014 but stated that she believed that DCS would take children with marks on them. She said that the grand jury indicted her on the same charge as Defendant and that she pled guilty pursuant to the State's offer of "a year['s] probation on a misdemeanor charge." Ms. Taylor testified that, after the victim's hands were injured, the victim did not cry when Ms. Taylor held his hands. She stated that she did not notice his hands swelling until he burned his hands. Ms. Taylor agreed that she told medical personnel that the victim burned his hands and buttocks on the heaters in the home, that the marks and abrasions on the victim occurred when he was playing with Defendant's nephews, and that she had no explanation for the victim's broken hands. Ms. Taylor testified that she had never spoken with K.W. about the events of March 5,

2014. Defense counsel asked her, "So if she . . . says that [the victim burned himself on the heaters] on the stand, she's believable, isn't she?" Ms. Taylor replied, "Correct."

On redirect examination, Ms. Taylor testified that, although the victim was "blacked out" and his "eyes [were] rolling back in his head[,]" Defendant took the time to fully clothe the victim before taking him across the street to seek assistance. On recross-examination, Ms. Taylor said that she thought the two original charges against her each would have carried twenty-five years' incarceration and that she pled to a misdemeanor for a suspended sentence of eleven months and twenty-nine days.

Autumn Warren testified that she worked as a registered nurse at LeBonheur Children's Hospital in March of 2014, when the victim was a patient. Ms. Warren said that, when she was changing the victim's diaper, he "started crying, and saying, 'Don't hurt me. Don't hurt me.'" After Ms. Warren completed the diaper change, she placed her hand behind the victim's neck to help him sit up. Ms. Warren stated that, as soon as she touched his neck, the victim said, "'Don't choke me' and then was just crying and saying that he has not been a bad boy."

Dr. Karen Lakin, the Medical Director at LeBonheur Children's Hospital and an assistant professor of pediatrics at the University of Tennessee, testified as an expert in both pediatrics and child abuse pediatrics. Dr. Lakin examined the victim and his medical records. She said that the burn on the victim's hand was a "partial thickness burn" which went into the deeper layers of skin on the palm. Dr. Lakin noted the scars on the victim's abdomen were "patterned injuries because they're actually in the shape of something" similar to a looped extension cord. Dr. Lakin stated that the victim's abdominal scars were "non-accidental injur[ies]." She testified that the burns on the victim's buttocks were "very deep burns" with "some patterned areas." Dr. Lakin said that, when burns are that severe and left untreated, the "delay of care" is "concerning for non-accidental trauma." Dr. Lakin testified that children may accidentally burn themselves with the same severity; however, with accidental burns, doctors see "a diffuse or glancing pattern" instead of a patterned injury where "something [was] preventing a child from getting away from the heat source[.]"

Dr. Lakin stated that the victim also had internal trauma, the most serious of which was an acute subdural hemorrhage, or bleeding in the brain, that likely occurred within the seventy-two hours prior to the victim's CT scan. Dr. Lakin testified that a subdural hemorrhage can be fatal and occurs from direct trauma or violent shaking rather than a "trivial household fall[.]" Because the victim also had abrasions on the sides of his head, Dr. Lakin stated, "[I]f [he was] hit on one side of the head and [his] head [flew] to the opposite side and hit[] a hard surface then [a subdural hemorrhage] might be a

mechanism that would occur." She said that symptoms of an acute subdural hemorrhage included changes in behavior, vomiting, seizures, and significant pain.

Dr. Lakin testified that the victim also had a duodenal hemorrhage, or bleeding in the abdomen, which occurs from blunt force trauma. She stated that a duodenal hemorrhage can happen accidentally when children are playing, typically as an injury from bicycle handlebars. Dr. Lakin said that the victim's liver enzymes showed trauma to the liver which does not occur accidentally. She stated:

> And so both [the subdural hemorrhage and the duodenal hemorrhage] can be very dangerous. . . . If [the blood] doesn't begin to absorb fairly quickly or kind of the shift normalizes, then they have to decompress it, and in [the victim's] case, he was very lucky because over the next [twenty-four] hours the shift began to go back -- began to normalize again so he did not have to decompress.

Dr. Lakin testified that the victim had "healing fractures" in both hands at different stages of healing, indicating the fractures occurred at separate incidents. She said that breaks to a child's hands do not occur from a fall, which typically generates breaks in the wrists.

On cross-examination, Dr. Lakin agreed that she did not know who was responsible for the victim's injuries and agreed that a parent would not know a child specifically had a subdural hemorrhage without a scan. She acknowledged that the injuries to the victim's hands could have been caused by the mother stepping on the victim's hands and that the injuries to the victim's abdomen could have been caused by another child hitting the victim with a baseball bat. On recross-examination, Dr. Lakin stated that, even though a parent could not see a subdural hemorrhage, a parent would know something was wrong with a child due to symptoms.

Dennis Mitchell testified that he was an investigator with the MPD. Investigator Mitchell stated that he participated in the ongoing investigation into the victim's injuries and that he had taken photographs of the victim's buttocks area the day before trial. Investigator Mitchell said that Ms. Taylor gave her statement regarding the victim's injuries before the grand jury indicted her. Investigator Mitchell stated that he had dealt with abused women before, that fear was common, and that Ms. Taylor's fear was justified.

On cross-examination, Investigator Mitchell testified that he chose not to charge Ms. Taylor when she gave her statement but that it was "a tough decision." He said that Ms. Taylor came into the police department voluntarily. Investigator Mitchell stated that

he did not realize Ms. Taylor was represented by an attorney at the time she chose to make her statement and agreed that it was a possibility that Ms. Taylor chose to give her statement to "cover herself."

Defendant testified that he began dating Ms. Taylor in October 2013, and that he was the father to three girls. Defendant agreed that, in March of 2008, he pled guilty to two charges of aggravated robbery but said that he "was 19 at the time, so [he] didn't understand what [he] was doing."

Defendant stated that Ms. Taylor told him that he could discipline her children if he wanted to because Ms. Taylor did not want the children to disrespect Defendant. Defendant testified that he told her, "[N]o, I don't touch other people['s] kids." Defendant said that Ms. Taylor would discipline her children in front of him by whipping them with a belt, her hand, or a shoe but that he never whipped the children.

Defendant testified that, on the evening of March 5, 2014, he and Ms. Taylor were arguing in the kitchen, and the victim was in the bathroom. He said they heard "a thump like a boom." Defendant testified that he thought the "thump" was from the victim's two sisters jumping off the bed. Defendant said that he planned to leave the house, but as soon as he walked by the bathroom, he saw the victim lying on the floor. He stated that he "scooped [the victim] up and came in the kitchen and told [Ms. Taylor]." Defendant testified that he panicked and that Ms. Taylor was crying. He stated the victim did not have clothes on and was wrapped in a towel. Defendant said that he wanted to take the victim to the emergency room but that Ms. Taylor did not because "she was in fear of her kids getting [taken]." Defendant stated that he took the victim across the street and asked Ms. Scott to call an ambulance and that Ms. Scott dressed the victim.

Defendant testified that, prior to March 5, 2014, Ms. Taylor told him about the burns on the victim's buttocks and stated that he did not cause the burns. He said that he wanted to take the victim to the emergency room when the victim was burned but that Ms. Taylor refused, saying, "[N]o, they're going to take my son." Defendant stated that Ms. Taylor's refusal to seek medical attention frustrated him, so he went across the street to Ms. Scott's house to get help. Defendant stated that both the victim and Defendant's nephew burned their hands while playing together near a heater.

On cross-examination, Defendant stated that, after the paramedics arrived on March 5, 2014, Defendant told police that he believed the victim slipped in the bathtub but that he was in the kitchen at the time. Defendant said that he told police about the burns on the victim's buttocks and hands. Defendant testified that, after the victim's buttocks were burned, he asked Ms. Scott to come and see the burns and to get her opinion on whether the victim should go to the emergency room. Then the following exchange occurred:

[THE STATE]: Now, you heard [K.W.] testify earlier. She was a pretty good kid, wasn't she?

[DEFENDANT]: Yes, ma'am.

[THE STATE]: Okay. Pretty honest little girl?

[DEFENDANT]: Yes, ma'am.

Defendant agreed that K.W. testified that Defendant hit her and the victim with a belt, but Defendant stated that he did not hit them. Defendant agreed that K.W. testified that she heard the victim in the bathroom saying "glub, glub, glub," but Defendant stated that he never heard the victim make that noise.

On rebuttal, Vicky Scott testified that she lived across from Defendant and Ms. Taylor in March of 2014 and that, on March 5, Defendant brought the victim to her home. Ms. Scott stated that the victim was naked and wrapped in a towel. Ms. Scott told Defendant to get the victim some clothes, and after about ten minutes, Ms. Scott's husband or daughter called for an ambulance. Ms. Scott said, "[Defendant] never insisted that nobody [sic] call 911. He kept on trying to wake the baby up to get the baby home." Ms. Scott testified that Defendant never consulted her regarding burns on the victim's buttocks. Ms. Scott said that Ms. Taylor asked her how to treat burns but that she never saw any burns on the victim until the night of March 5. On cross-examination, Ms. Scott testified that she never heard Ms. Taylor express fear that DCS would take her children. She stated that Defendant brought the victim to her house because Defendant did not know what to do.

The State elected to proceed in count one, which alleged that the abuse caused "serious bodily injury," with the head injury the victim suffered on March 5, 2014. In count two, which alleged that the abuse was "especially heinous, atrocious, or cruel, or involved the infliction of torture on the victim," the State elected to proceed with the injuries occurring prior to the night of March 5, 2014, to include the victim's whip marks, burns, and broken hands. Following deliberations, the jury found Defendant guilty of two counts of aggravated child abuse.

### Sentencing Hearing

At the sentencing hearing, the State introduced Defendant's presentence report. The trial court applied five sentencing enhancement factors: (4) that the victim was particularly vulnerable due to age, (5) that Defendant used exceptional cruelty, (6) that

the personal injuries were particularly great, (10) that Defendant had no hesitation about committing the crime when the risk of danger to human life was high, and (13) that Defendant was on parole at the time of the offense. Tenn. Code Ann. § 40-35-114 (2015). The trial court sentenced Defendant as a Range II multiple offender to thirty-five years' incarceration for each count. The court then applied three consecutive sentencing factors: (2) that Defendant was an offender whose record of criminal activity was extensive; (4) that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high; and (6) that Defendant was sentenced for an offense committed while on probation. Tenn. Code Ann. § 40-35-115 (2015). The court imposed consecutive sentences, for an effective sentence of seventy years at 100%.

## Analysis

On appeal, Defendant contends that the trial court erred in admitting testimony bolstering K.W.'s character, medical records including the victim's hearsay statements to a nurse, and evidence of Defendant's prior bad acts. Defendant claims that these cumulative errors necessitate a new trial. Defendant also claims the evidence was insufficient to support his convictions and that his sentence violated the purposes and principles of the Sentencing Reform Act. The State responds that the trial court properly admitted the evidence and, alternatively, that Defendant waived these issues by failing to raise contemporaneous objections at trial and that Defendant cannot show plain error. The State also claims the evidence was sufficient to support the convictions and that the trial court did not abuse its discretion in sentencing Defendant.

### *Evidentiary Issues*

Bolstering K.W.'s Credibility

Defendant contends that the State impermissibly bolstered K.W.'s testimony because defense counsel only attacked K.W.'s recollection of events and not her general character for truthfulness. Defendant also asserts that the State had already rehabilitated K.W.'s testimony through the introduction of portions of the forensic interview, and thus, Ms. Taylor's testimony only served to bolster K.W.'s credibility. Further, Defendant argues that because the State's case against Defendant "depended almost entirely" upon K.W.'s testimony, the bolstering error was not harmless. The State responds that the evidence of K.W.'s general character for truthfulness was properly admitted, and if admission was improper, it was not plain error.

During the direct examination of K.W., the State asked for a jury-out hearing in which it identified two of K.W.'s statements from the forensic interview that it claimed

were inconsistent with her trial testimony. Citing Tennessee Rules of Evidence 803(26) and 613(b), the State requested permission to play portions of the forensic interview for the jury. During the forensic interview, K.W. stated that Defendant hit the victim in the stomach and back with his fist and that Defendant was the only person in the bathroom with the victim. The trial court allowed these portions of the forensic interview to be played for the jury and allowed K.W. to be questioned about the inconsistencies between her trial testimony and what she stated in the forensic interview five days after the victim was injured.

Initially, we note that the record does not include the video of the forensic interview or the transcript of the forensic interview that was discussed during the jury out hearing. There is no way we can know what the jury or the witness saw or heard when portions of the video were played. We can only infer from the questions and answers given during direct examination that the portion of the video shown to the jury related to inconsistencies in K.W.'s trial testimony and what she said during the forensic interview. The party seeking appellate review of an issue has a duty to prepare a record that conveys a "complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Because Defendant has failed to prepare an adequate record, this issue is waived.

Victim's Statements to Nurse

Defendant concedes that the victim's medical records fall under the business records hearsay exception but asserts that the trial court erred in permitting the State to introduce the victim's statements to Ms. Warren which were included in the medical records. Defendant claims that the statements are hearsay and do not fall within one of the exceptions to the hearsay rule. The State responds that the victim's statements to his nurse were not hearsay and thus were admissible.

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802.

In *Kendrick v. State*, our supreme court addressed the standard of review applicable to the review of hearsay statements:

> The standard of review for rulings on hearsay evidence has multiple
> layers. Initially, the trial court must determine whether the statement is

hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions.

454 S.W.3d 450, 479 (Tenn. 2015).

Here, the victim was crying and said to Ms. Warren as she was changing his diaper, "Don't hurt me" and "Don't choke me." These statements were commands or requests and were not offered for the truth of the matter. *See State v. Charles O. Emesibe*, No. M2003-02983-CCA-R3-CD, 2005 WL 711898, at *10 (Tenn. Crim. App. Mar. 28, 2005) (stating that "a command for the defendant to shoot the victim or a plea for the defendant not to harm the victim are clearly orders or commands not offered for the truth of the matter asserted"), *perm. app. denied* (Tenn. Oct. 17, 2005). Moreover, the victim's statement that he was not a "bad boy" was not offered to prove that he was not a bad boy and thus was not hearsay. Therefore, the statements from the victim to Ms. Warren were admissible as non-hearsay.

Defendant argues that the victim's statements to Ms. Warren were not relevant because "they served no purpose except to inflame the passions of the jury." The State responds that the statements in the victim's medical records contradict the defense theory that the victim accidentally hurt himself.

Even if a statement is admissible under a hearsay exception or is non-hearsay, it still must be relevant to be admissible. Tenn. R. Evid. 402. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

We agree with the State that the medical records were relevant because they contradict Defendant's theory that the victim accidentally burned himself. Additionally, the victim's statements, which show the victim's fear when he soiled his pants, corroborate Ms. Taylor's testimony that Defendant abused the victim when he soiled himself.

Rule 404(b)

Defendant argues that Ms. Taylor's and K.W.'s testimonies regarding Defendant's prior bad acts of abuse were inadmissible under Tennessee Rule of Evidence 404(b). Specifically, Defendant argues of K.W.'s testimony – that Defendant "yelled at the children and whipped them" and that her mother was "scared of [Defendant][,]" as well as Ms. Taylor's testimony that Defendant called her offensive names, that he "choked" and "bit" her, and that she blacked out – should not have been admitted. The State responds that the record is insufficient to review this claim for plain error and,

- 13 -

alternatively, that the trial court properly admitted the evidence under Tennessee Rule of Evidence 404(b).

Because Defendant failed to make a contemporaneous objection to the evidence and failed to request a jury-out hearing to determine its admissibility under 404(b), we will "not consider whether the evidence should have been excluded under Tennessee Rule of Evidence 404(b)" and will consider the issue waived. *See State v. Jones*, 151 S.W.3d 494, 503 n. 3 (Tenn. 2004); *State v. Gordon Scot Katz*, No. E2017-02516-CCA-R3-CD, 2018 WL 4697267, at *5 (Tenn. Crim. App. Oct. 1, 2018) ("The argument that evidence should have been admitted or excluded under Rule 404(b) is . . . waived when the defendant fails to request a hearing."), *perm. app. denied* (Tenn. Jan. 16, 2019); *but see State v. Tony Edward Bigoms*, No. E2015-02475-CCA-R3-CD, 2017 WL 2562176, at *23 (Tenn. Crim. App. June 7, 2017) (stating that because the defendant timely objected to the 404(b) evidence and the State requested a jury-out hearing at trial, the defendant was not "procedurally barred from arguing that the trial court erred by not applying Rule 404(b)" even though the defendant did not request a 404(b) hearing), *no perm. app. filed*.

Defendant is not entitled to relief on this issue.

Cumulative Error

Defendant contends that the trial court's multiple errors in admitting "inflammatory and prejudicial" evidence necessitate a new trial. The State responds that no errors occurred and that the alleged errors have no interrelationship that would warrant a cumulative error analysis.

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. Here, Defendant has failed to demonstrate any errors in the trial court's admission of evidence. Thus, Defendant is not entitled to cumulative error relief.

### *Sufficiency of the Evidence*

Defendant contends that, after excluding the inadmissible evidence, the remaining evidence was insufficient to establish Defendant as the "sole perpetrator" of the victim's injuries. Defendant argues that, because the identity of the perpetrator is an essential element of the crime, and because Ms. Taylor's and K.W.'s inadmissible testimonies

- 14 -

were the only evidence that Defendant was the "sole perpetrator," the evidence is insufficient to support his conviction. Defendant suggests this court disregard Ms. Taylor's and K.W.'s testimonies as inadmissible evidence in making this sufficiency determination. The State responds that a sufficiency determination includes improperly admitted evidence and, even if the allegedly inadmissible evidence were excluded, there was still sufficient evidence to sustain Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here,

A person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in [Tennessee Code Annotated section] 39-15-401(a)[,] . . . and

(1) [t]he act of abuse . . . results in serious bodily injury to the child; [or]

. . . .

(3) [t]he act of abuse . . . was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim[.]

Tenn. Code Ann. § 39-15-402(a)(1), (3) (2014).

- 15 -

A person commits child abuse "who knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury[.]" Tenn. Code Ann. § 39-15-401(a) (2014).

> "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(d) (2014).

When viewed in the light most favorable to the State, the evidence established that Defendant perpetrated aggravated child abuse against the victim in both counts one and two. The evidence which Defendant asks this court to exclude in its sufficiency analysis was not inadmissible. Moreover, even if evidence was improperly admitted, "the sufficiency of the evidence is reviewed with improperly admitted evidence." *State v. Charlene Trussell*, No. E2016-00003-CCA-R3-CD, 2017 WL 2334231, at *5 (Tenn. Crim. App. May 30, 2017) (citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)), *no perm. app. filed*.

In count one, which alleged that the abuse caused serious bodily injury, the State elected to proceed on the head injury which the victim suffered on March 5, 2014. Dr. Lakin's testimony established that the injury to the victim's head was a subdural hemorrhage, which can be fatal and occurs from direct trauma or violent shaking rather than a "trivial household fall[.]" K.W.'s forensic interview established that Defendant was alone with the victim in the bathroom when he lost consciousness, and K.W.'s testimony established that she heard a thump and heard the victim say "glub, glub, glub" and cry. Ms. Taylor's testimony established that Defendant punished the victim when he soiled himself and that the victim had soiled himself right before his injuries on March 5, 2014. Ms. Taylor also testified that the victim was unconscious and his eyes were rolling back when Defendant brought the victim out of the bathroom. Ms. Scott's testimony established that Defendant had no desire to call an ambulance for the victim on the night of March 5, 2014, and that the victim remained unconscious for ten minutes before the ambulance was called. Officer Autrey's testimony established that the victim was still unconscious when Officer Autrey arrived at the scene. There was sufficient evidence that Defendant knowingly inflicted the victim's head injury on March 5, 2014. Moreover, the evidence supported the jury's finding that the victim's head injury constituted serious bodily injury because it involved subdural bleeding, a substantial risk of death, and protracted unconsciousness. It is for the jury to discern questions of fact, the credibility

of witnesses, and weight of the evidence, and this court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659.

In count two, which alleged that the abuse was especially heinous, atrocious, or cruel, or involved the infliction of torture on the victim, the State elected to proceed on the injuries occurring prior to the night of March 5, 2014, including the victim's whip marks, burns, and broken hands. Ms. Taylor's testimony established that Defendant was with the victim whenever he was injured during the three months before March 5, 2014. Ms. Warren's testimony established that the victim was frightened of being hurt and choked when she changed his soiled diaper. Dr. Lakin's testimony established that the victim's burns were patterned injuries where "something [was] preventing [the victim] from getting away from the heat source[.]" Dr. Lakin's testimony also established that the victim's broken hands occurred from two separate incidents and that such breaks did not occur from an accidental fall. There was sufficient evidence that Defendant knowingly inflicted the victim's burns, whip marks, and broken hands.

Moreover, the evidence supports the jury's finding that the abuse was especially heinous, atrocious, or cruel, or involved the infliction of torture on the victim. In *State v. Patrick Wayne Tripp*, this court found that there was sufficient evidence that the defendant was cruel and torturous in committing aggravated child abuse because he caused blistering to the victim's mouth and caused severe bruising to the victim's groin area. No. M2009-01203-CCA-R3-CD, 2010 WL 4054314, at *30 (Tenn. Crim. App. Oct. 15, 2010), *no perm. app. filed*. In the same way, there was sufficient evidence that Defendant was cruel and torturous because he inflicted serious injuries to the victim's hands, abdomen, head, and buttocks, occurring in several incidents over the course of several months. Defendant is not entitled to relief.

### *Sentencing*

Defendant contends the trial court's imposition of two consecutive thirty-five-year sentences was not appropriate because the enhancement factors and the consecutive sentencing factors relied on by the trial court were duplicative of each other and of the statutory offense of aggravated child abuse. The State agrees that the court misapplied sentencing enhancement factors (5) and (6) and consecutive sentencing factor (6) but contends that Defendant's sentence is justified because the trial court did not wholly depart from the Sentencing Act.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682,

707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." *Bise*, 380 S.W.3d at 709. Moreover, under those circumstances, this court may not disturb the sentence even if it had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2015); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103(5) (2015).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2015); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2015), Sentencing Comm'n Cmts. In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. 432 S.W.3d 851, 859 (Tenn. 2013).

Because the victim was eight years of age or less, Defendant's crime was a Class A felony. Tenn. Code Ann. § 39-15-402(b) (2014). The sentence range for a Range II multiple offender, convicted of a Class A felony, is twenty-five to forty years. *See* Tenn. Code Ann. § 40-35-112(b)(1) (2015). Within-range sentences that are supported by the record and reflect that the trial court properly applied the purposes and principles of sentencing are reviewed for an abuse of discretion, with a presumption of reasonableness.

*Bise*, 380 S.W.3d at 707-08. A trial court may not apply an enhancement factor that is "already an essential element of the offense." Tenn. Code Ann. § 40-35-114 (2015).

## Enhancement Factors

Defendant challenges the trial court's use of five sentencing enhancement factors. Regarding enhancement factor (4), that the victim was "particularly vulnerable because of age[,]" Defendant argues that the victim's young age is an essential element of the offense of aggravated child abuse. Tenn. Code Ann. § 40-35-114(4) (2015); § 39-15-402(a)(1), (a)(3), (b) (2014).

Our supreme court has determined that enhancement factor (4) "relates more to the natural physical and mental limitations of the victim than merely to the victim's age." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993), *superseded by statute on other grounds*. To justify the use of enhancement factor (4), the State must provide some evidence in addition to the victim's age to establish vulnerability to the particular crime charged. *See State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001) ("A vulnerability that is wholly irrelevant to the crime is not 'appropriate for the offense' as required by Tenn[essee] Code Ann[otated section] 40-35-114."); *State v. Poole*, 945 S.W.2d 93, 97 (Tenn. 1997). This court has previously affirmed the use of enhancement factor (4) when a two-year-old victim "was completely powerless to prevent the abuse inflicted on her by the adult defendant[,]" even though the age of the victim was an essential element of the crime. *State v. Amanda Lee Sutton*, No. E1999-00920-CCA-R3-CD, 2000 WL 1456941, at *5 (Tenn. Crim. App. Oct. 2, 2000), *no perm. app. filed*.

Here, the three-year-old victim, like the victim in *Amanda Lee Sutton*, "was completely powerless to prevent the abuse inflicted on" him by Defendant. *See id.* The nature of the aggravated child abuse was such that physical strength and size to overpower the victim contributed to the commission of the offense. Thus, beyond the victim's age, the victim's vulnerability of size and strength is relevant. Therefore, the trial court properly applied enhancement factor (4).

Next, Defendant argues that the record does not support the trial court's finding that Defendant had no hesitation about committing a crime when the risk to human life was high under Tennessee Code Annotated section 40-35-114(10)[2] and that the trial court

---

[2] In his brief, Defendant refers to enhancement factor (10) as the "dangerous offender" sentencing enhancement. The term "dangerous offender" is from Tennessee Code Annotated section 40-35-115(b)(4), regarding consecutive sentencing for multiple offenses, which Defendant also argues was improperly applied. We read Defendant's argument in this section of his brief as contending that the trial court improperly applied Tennessee Code Annotated section 40-35-114(10).

improperly used the same factor to impose consecutive sentencing. The State responds that the trial court properly found that Defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10) (2015). We agree with the State.

Enhancement factor (10) may be applied in aggravated child abuse cases despite the essential element of "serious bodily injury" because "the State may prove serious bodily injury without showing a risk of death." *State v. Rashii Brisbon*, No. M2012-00671-CCA-R3-CD, 2013 WL 1087607, at *19 (Tenn. Crim. App. Mar. 13, 2013), *no perm. app. filed*. Here, as stated above, the State established serious bodily injury through subdural bleeding, a substantial risk of death, and protracted unconsciousness. Therefore, because three different facts established the essential element of "serious bodily injury," the trial court properly used "substantial risk of death" as an enhancement factor at sentencing.

Next, Defendant argues that the use of enhancement factor (13),[3] that Defendant was released on parole at the time of the felony offense, was inappropriate because it was not supported by the record and because the trial court also used Defendant's parole as a reason to impose consecutive sentences.[4] The State argues that the record supports the fact that Defendant was on parole at the time of the offenses and that the trial court was within its discretion to use Defendant's parole as a sentencing enhancement factor. We agree with the State.

Defendant's presentence report states that he was on parole at the time of the offenses, so the record supports the trial court's use of enhancement factor (13). Defendant argues that in order for a trial court to use a fact to both enhance a sentence and impose consecutive sentences, the trial court "must provide legal and factual support for its decision to 'double up' on the same set of facts." Defendant provides no legal basis for this contention except to suggest that if a trial court fails to provide such legal and factual support, the trial court does not comply with the purposes and principles of sentencing. However, this court has previously held that

---

[3] Defendant improperly cites to Tennessee Code Annotated section 40-35-114(8). The State sought and the trial court found enhancement factor (13), not factor (8).

[4] Defendant was on parole for an eight-year sentence for two aggravated robberies when the offenses in this case occurred. As a result of the charges in this case, his parole was revoked on May 23, 2014. The eight-year sentence expired on January 4, 2015, before Defendant was convicted by a jury in this case. Therefore, the mandatory consecutive provision of Tennessee Rule of Criminal Procedure 32(c)(3)(A) does not apply.

[t]he use of enhancement factors to increase the length of a sentence within the appropriate range does not bar the use of these facts in determining whether consecutive sentences should be imposed. This [c]ourt has held that such double use of the factors does not do violence to any constitutional provision, statute, rule or common law decision.

*State v. Melvin*, 913 S.W.2d 195, 205 (Tenn. Crim. App. 1995). Regardless, as explained below, the trial court improperly relied on Defendant's parole status to order consecutive sentencing. Defendant's argument of improper "doubling up" is without merit.

Finally, Defendant argues, and the State concedes, that the trial court improperly applied sentencing enhancement factors (5) and (6) when imposing sentence. We agree that enhancement factor (5), *i.e.*, that the defendant treated the victim with "exceptional cruelty," is an essential element of aggravated child abuse in count two and was inapplicable as to the sentence for that count. *See* Tenn. Code Ann. § 39-15-402(a)(3) (2014).

"Exceptional cruelty" is not an essential element of aggravated child abuse under "serious bodily injury" in count one, but the trial court did not make any findings about which of Defendant's actions, "apart from the elements of the offense, constituted 'exceptional cruelty.'" *State v. Goodwin*, 909 S.W.2d 35, 46 (Tenn. Crim. App. 1995). However, in *State v. Poole*, "our supreme court found enhancement factor (5) applicable, despite the fact the trial court made no findings to support its application." *State v. Barbri Michelle Brown*, No. M2002-01497-CCA-R3-CD, 2003 WL 1715836, at *3 (Tenn. Crim. App. Apr. 1, 2003) (citing *Poole*, 945 S.W. 2d at 99), *perm. app. denied* (Tenn. July 7, 2003). The *Poole* court found that, in the record, "there was evidence of exceptional cruelty[,]" and thus, the trial court properly applied enhancement factor (5) despite its failure to make findings on the record. *Poole*, 945 S.W. 2d at 99.

In the same way, we find that the trial court properly applied the "exceptional cruelty" enhancement factor to count one, despite the trial court's failure to state its reasons on the record. The evidence showed that Defendant caused the victim's head injury and subdural hemorrhage because the victim had soiled himself, which shows the exceptional cruelty of Defendant's punishment for a common childhood accident. When the victim suffered a subdural hemorrhage and lost consciousness, Defendant took the victim across the street but made no effort to summon medical assistance. Ms. Scott testified that Defendant "never insisted that nobody [sic] call 911. He kept on trying to wake the baby up to get the baby home." This testimony shows the cruelty Defendant had in delaying medical care to an unconscious child. Dr. Lakin testified that a delay in medical care was "concerning for non-accidental trauma" and that a subdural hemorrhage could be fatal. As was the case in *Poole*, "[b]ecause of the delay in receiving medical

treatment," the victim "was very lucky" to have survived "very dangerous" injuries. *See Poole*, 945 S.W.2d at 99. The trial court properly applied enhancement factor (5) to count one but improperly applied the enhancement factor to count two.

Similarly, the trial court improperly applied enhancement factor (6) to count one and properly applied enhancement factor (6) to count two. Factor (6), that the victim suffered "particularly great" physical injury, is an essential element of aggravated child abuse in count one and thus was inapplicable to that sentence. *See* Tenn. Code Ann. § 39-15-402(a)(1) (2014); *State v. Thomas Fancher Greenwood*, No. M2013-01924-CCA-R3-CD, 2014 WL 6609308, at *37 (Tenn. Crim. App. Nov. 21, 2014) (stating that the trial court improperly applied enhancement factor (6) because serious bodily injury was an element of aggravated child abuse), *perm. app. denied* (Tenn. Apr. 10, 2015). However, in count two, the trial court properly found that the victim's injuries were particularly great. The victim suffered severe burns to his hands and buttocks, broken bones in both his hands from separate incidents, as well as several whip marks in various stages of healing. Thus, the trial court properly applied enhancement factor (6) to count two.

Regardless of any misapplication of enhancement factors, because the trial court properly applied four enhancement factors for each of the two counts, the presumption of reasonableness remains, and this court "will leave the decision entrusted to the discretion of the trial court undisturbed." *Bise*, 380 S.W.3d at 702. Defendant is not entitled to relief.

Consecutive Sentencing

Defendant argues that the trial court improperly imposed consecutive sentencing because two of the consecutive sentencing factors, that Defendant was on parole at the time of the offense and that Defendant was a dangerous offender, were duplicative of the sentencing enhancement factors and because Defendant did not have "an extensive criminal history beyond that necessary to establish his sentence range." The State concedes that the trial court improperly imposed factor (6) for consecutive sentencing purposes but contends that factors (2) and (4) support the trial court's decision.

First, regarding factor (2), that Defendant had an extensive criminal history, Defendant argues that his two convictions for aggravated robbery occurred on the same night, and his only remaining conviction was driving on a suspended license. Defendant asserts that his "driving offense was thus the only remaining conviction on [Defendant's] record that was beyond the criminal history necessary to establish the sentencing range."

- 22 -

Tennessee Code Annotated section 40-35-115(b)(2) states that, if a defendant is convicted of more than one criminal offense, "the court may order the sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is an offender whose record of criminal activity is extensive." Moreover, a defendant's current offenses may be used in determining criminal history for consecutive sentencing. *State v. Richard Hanke, Sr.*, No. W2011-01830-CCA-R3-CD, 2012 WL 4470964, at *4 (Tenn. Crim. App. Sept. 27, 2012), *no perm. app. filed*.

Defendant does not challenge the trial court's determination that he is a Range II multiple offender based on his two prior convictions for aggravated robbery. Defendant's criminal history also included the two convictions for aggravated child abuse in the present case, one conviction for driving on a suspended license, and one conviction for domestic assault. This record was sufficient to establish Defendant's "extensive criminal history" for the purpose of consecutive sentencing.

Next, Defendant argues that the trial court improperly applied factor (4), that he was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2015). Defendant claims the trial court "failed to provide any reasoning for punishing [Defendant] as a dangerous offender[.]" The State agrees that the trial court did not "make a finding about the reasonable relation to the severity of the offenses."

To impose consecutive sentences on the basis that a defendant is a dangerous offender, the court must determine that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). "The need for the additional findings before imposing consecutive sentencing on the basis of the 'dangerous offender' provision arises, in part, from the fact that this category 'is the most subjective and hardest to apply.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

At the sentencing hearing, the trial court found that, for the purposes of consecutive sentencing, "[Defendant's] record establishes the fact that he is a dangerous offender with little or no regard for human life[.]" The State then pointed out that the trial court had to find that the consecutive sentencing "was for the benefit of the public at large." The trial court stated, "That is correct." However, on appeal, the State concedes that the trial court did not expressly find "that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *See id.*

In *Pollard*, our supreme court found that merely stating that a defendant "was a dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high" was insufficient under *Wilkerson*. *Pollard*, 432 S.W.3d at 855. The Court explained:

> Where, as here, the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority. Faced with this situation, the appellate court has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences.

*Id*. at 863-864.

Here, we choose to conduct a de novo review to determine whether the consecutive sentences reasonably relate to the severity of the offenses committed because there are sufficient facts in the record to make this determination. As discussed above, the offenses against the victim were severe. The testimony established that Defendant repeatedly injured the victim by burning away significant portions of skin, breaking his hands in different incidents, leaving whip marks in different stages of healing, and causing a subdural hemorrhage which could have been fatal. Defendant did not call 911 or otherwise seek medical attention for the victim. Based on our de novo review of the record, we determine that "an extended sentence is necessary to protect the public against further criminal conduct" by Defendant and that "the severity of the offenses committed" support consecutive sentences. *Wilkerson*, 905 S.W.2d at 939. Thus, the trial court did not err in determining that Defendant was a "dangerous offender" and properly applied factor (4).

Finally, Defendant argues that the trial court improperly applied factor (6), that he was on parole at the time of the offense, because the trial court also used this factor as a sentencing enhancement factor.

Tennessee Code Annotated section 40-35-115(b)(6) states that, if a defendant is convicted of more than one criminal offense, "the court may order the sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is sentenced for an offense committed while on probation[.]" The trial court opined that "it logically would be" that "the law [would] allow [the court] to consider a parole offense as a probation violation" for the purpose of consecutive sentencing. However, this court has held that "[t]he term 'probation' is not synonymous with the term

'parole' for purposes of Tennessee Code Annotated section 40-35-115. Because parole status is not addressed in Tennessee Code Annotated section 40-35-115(b), this is not a statutory basis for ordering consecutive sentences." *State v. Tracy Thomas Hepburn*, No. M2008-01979-CCA-R3-CD, 2010 WL 2889101, at *10 (Tenn. Crim. App. July 23, 2010) (internal citations omitted), *perm. app. denied* (Tenn. Jan. 13, 2011). Thus, the trial court erred in using Defendant's parole status as a factor for consecutive sentencing.

The trial court improperly applied consecutive sentencing factor (6). However, Defendant had an extensive criminal history as shown in the record, and "[e]xtensive criminal history alone will support consecutive sentencing." *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Moreover, Defendant was a dangerous offender who had little regard for human life. *See* Tenn. Code Ann. § 40-35-115(b)(4). Thus, the trial court did not abuse its discretion in imposing consecutive sentences. Defendant is not entitled to relief.

### *Clerical Error in Judgment Forms*

We note that the trial court improperly selected "aggravated child neglect/endangerment 85%" under "release eligibility" on each judgment form instead of "40-35-501(i) 100%." Defendant was convicted of aggravated child abuse under Tennessee Code Annotated section 39-15-402. Under this section, a defendant may be charged with aggravated child endangerment, aggravated child neglect, or aggravated child abuse. Tenn. Code Ann. § 39-15-402 (2014). When a defendant is convicted of aggravated child neglect or endangerment, the release eligibility is eighty-five percent (85%). Tenn. Code Ann. § 40-35-501(k)(6)(B) (2015). When a defendant is convicted of aggravated child abuse, there is no release eligibility, and "[t]he person shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained." Tenn. Code Ann. § 40-35-501(i)(1), (2)(K) (2015). Therefore, we remand to the trial court for entry of corrected judgments.

### <u>Conclusion</u>

For the foregoing reasons, the judgments of the trial court are affirmed, and we remand to the trial court for entry of corrected judgments.

_____
ROBERT L. HOLLOWAY, JR., JUDGE